**CIRCUIT CITY STORES, INC., et al., Plaintiffs–Appellees,**

v.

**CARMAX, INC.; Philip Artz; Harold Artz, Defendants–Appellants.**

No. 97–4104.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 21, 1998.

Decided Jan. 22, 1999.

Richard M. Knoth (argued and briefed), Jayne L. Jakubaitis (briefed), Arter & Hadden, Cleveland, OH, Nancyellen Keane (briefed), Glen Allen, VA, for Plaintiff–Appellee.

Bruce O. Baumgartner (argued and briefed), Baker & Hostetler, Raymond Rundelli (briefed), Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for Defendants–Appellants.

Before: MERRITT, JONES, and SILER, Circuit Judges.

MERRITT, J., delivered the opinion of the court, in which SILER, J., joined. JONES, J. (pp. 1056–57), delivered a separate concurring opinion.

## OPINION

MERRITT, Circuit Judge.

In this action, the plaintiffs, Circuit City companies, sue the defendants, CarMax, Inc., Philip Artz and Harold Artz, for trademark infringement and unfair competition under the Lanham Act §§ 32, 45(a), 15 U.S.C.A. §§ 1114, 1125(a). Circuit City also sues under Ohio law for deceptive trade practices and unfair competition. Circuit City's claims stem from the defendants' use of the "CarMax" service mark which Circuit City had duly registered on the federal Principal Register. The defendants pled an affirmative defense of senior use of the CarMax mark and also brought a counterclaim against Circuit City for fraudulent registration. The District Court entered judgment for Circuit City and awarded injunctive relief against the defendants.

The issue on appeal is whether the District Court erred in rejecting the defendants' af-

firmative defense that they were the senior user of the CarMax mark. Specifically, the defendants argue that the District Court's factual findings were clearly erroneous with regard to the extent of the defendants' prior use of the CarMax mark. The defendants also argue that the District Court wrongly required proof of secondary meaning in order to establish a common law right of ownership in the CarMax mark. In the alternative, the defendants claim that the District Court applied the wrong legal standard for injunctive relief because the Court presumed that Circuit City would suffer irreparable injury without requiring a specific showing that Circuit City was likely to enter the defendants' market. The defendants also argue that the District Court erred by admitting certain evidence relevant to Circuit City's good faith defense to the defendants' fraud counterclaim. We agree with the District Court in this fact-intensive case that the defendants were simply unable to show a sufficient use of the "CarMax" mark to give them an intellectual property right superior to Circuit City's.

## I. BACKGROUND

This case requires a detailed recitation of the facts. All of the plaintiffs' claims stem from the defendants' use of the CarMax mark in connection with their used car business in Northeast Ohio. The defendant CarMax is an Ohio corporation with its principal place of business in Willoughby, Ohio. The defendants Harold Artz and his son Philip incorporated CarMax in 1990. The defendants formed the CarMax name by combining the names of Philip's two sons, Carson and Max. Prior to incorporating CarMax, the Artzes were in the new car dealership business in the greater Cleveland area. By the late 1980s, they referred to their businesses as the "Artz Auto Group." The Artzes incorporated CarMax with the intention of expanding into the sales of used cars. The Artzes leased a facility in Willoughby in 1990 for this purpose. Around the same time, the Artzes obtained a "Budget Rent A Car" license to establish a rental car business in Willoughby. Both the rental car and used car businesses began operating in November 1990 out of the Willoughby facility leased by

the defendants. The Artzes also established a nominal new car business in the Willoughby facility in order to circumvent a town ordinance prohibiting the sale of used cars except by new car dealers.

The plaintiffs include Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., C–Max Auto Superstores, Inc. and CarMax the Auto Superstores (collectively referred to as "Circuit City"). Circuit City chose the name "CarMax" as the service mark for its concept of used car superstores developed in 1991. On June 22, 1993, Circuit City filed an "intent to use" application with the United States Patent and Trademark Office with the hope of registering the mark on the Principal Register. Circuit City opened its first CarMax auto store in Virginia in September 1993, and it obtained federal registration of the CarMax mark on December 12, 1995.

The defendants have made continued use of the CarMax mark since Circuit City's application for federal registration of the mark on June 22, 1993. On September 11, 1996, Circuit City filed a complaint against the defendants for trademark infringement and unfair competition under the Lanham Act §§ 32, 45(a), 15 U.S.C.A. §§ 1114, 1125(a). Circuit City also brought claims of unfair competition and deceptive trade practices under Ohio Rev.Code Ann. § 4165.02 (West 1998) and Ohio common law. The defendants answered Circuit City's complaint and offered an affirmative defense, claiming that they were the senior user of the CarMax mark in Northeast Ohio. The defendants alleged that they "adopted and began using the trade name 'CarMax' at least as early as June 1991," which was two years prior to Circuit City's intent to use application to the Trademark and Patent Office. The defendants also brought a counterclaim against Circuit City, alleging that Circuit City fraudulently obtained federal registration of the CarMax mark and name. The District Court had jurisdiction over Circuit City's suit under 28 U.S.C. § 1338(a), (b). District Court Judge David D. Dowd, Jr. conducted a bench trial of all the parties' claims and counterclaims in June 1997.

At the trial, the defendants offered evidence of their use of the CarMax mark between the 1990 incorporation of CarMax and Circuit City's application for registration in June 1993, i.e., the "relevant time period." Much of the defendants' evidence pertained to their alleged use of the CarMax mark in radio advertisements during the relevant time period. The defendants claim that local radio stations carried a rotation of advertisements for the Artz Auto Group, which included CarMax as well as the new car dealerships owned by the defendants. Philip Artz testified that the defendants advertised on the FM stations of WDOK, WMMS, WQAL and WNCX and their AM sister stations as well. Artz submitted a transcript of one of the alleged advertisements, which read:

> Are you ready for a new car, but when you visited the dealership came down with a bad case of sticker shock, then you need to come see us at CarMax in Willoughby. CarMax cures sticker shock. We have a huge inventory of late model used cars, most with the remainder of the factory warranty, all quality inspected. CarMax offers low milage (sic) used cars and we save you thousands off the price of a new car. Why by (sic) a new car when you can save thousands on a late model, low mileage used car at CarMax. If you cant (sic) tell the difference why pay the difference? So if you have come down with a bad case of sticker shock, come see us, were (sic) conveniently located on the corner of Erie and Vine in Willoughby. At CarMax we have the cure for sticker shock.

Philip Artz had found this transcript in his business files, and he testified that he wrote it himself for use on the radio sometime during the relevant time period. Though Artz was not certain of precisely when the advertisement aired over the radio, he was confident that it was sometime in the "early 1990's" because the advertisement's themes were consistent with the defendants' marketing strategies at the time.

Philip Artz also testified to the frequency of radio advertisements during the relevant time period. Artz estimated that the radio stations played a total of three hundred advertisements a month for the Artz Auto Group. Of these three hundred advertisements, anywhere between fifteen and twenty-five percent were for CarMax. Artz did not present any documentary evidence of advertising arrangements between the radio stations and the defendants, but he did claim that he could "make a pretty good guess" of the total monthly advertisements for the Artz Auto Group and CarMax's share of those ads. Artz testified that he did not ordinarily keep records of the advertising deals with the radio stations because he conducted such business on a "trade basis" rather than in cold cash. Artz alleged that the defendants basically traded cars to the radio stations in return for advertising air time.

Two radio company officials also offered testimony on the defendants' CarMax advertisements during the relevant time period. Tom Embrescia, owner, chairman, and president of WDOK FM and its sister station WRMR AM, testified that he entered into an agreement with Philip Artz in 1991 to exchange $100,000 of annual advertising for the use of two cars. Embrescia entered into the same agreement with the defendants in both 1992 and 1993. Embrescia claimed that this deal allowed the defendants anywhere from twenty to forty commercials a month on WDOK and forty to seventy commercials a month on WRMR. Around twenty five percent of these commercials, in Embrescia's estimation, were for CarMax. Embrescia testified that he was able to remember that CarMax was part of the ad rotation in light of the unique and personal roots of the CarMax name. Embrescia distinctly recalled discussing CarMax with Philip Artz when they were negotiating the advertising arrangement because Artz had explained to him then that the CarMax name stemmed from the names of his two sons. Embrescia also testified that he remembered hearing CarMax ads on both WDOK and WRMR. Embrescia did not produce any documentary evidence of his dealings with the defendants, nor did he produce any documentary evidence of the CarMax ads on WDOK and WRMR. Embrescia testified that the records and tapes of the CarMax ads had been routinely discarded.

Gaye Ramstrom, national sales manager for WMMS, also testified for the defendants. Ramstrom claimed that the CarMax ads aired on WMMS somewhere between twelve to twenty times a month. Ramstrom admitted that she was just "guessing" about the frequency of CarMax ads. Ramstrom also testified that she remembered hearing Car-Max ads on WMMS while driving in her car five or six times in 1991 and 1992 and three times in 1993. Like Embrescia, Ramstrom testified that she was sure of her recollections in light of the family connections behind the CarMax mark. Ramstrom claimed that she remembers hearing CarMax ads in the early 1990s and thinking that they were "very nice" and "sweet" because the CarMax name was a hybrid of the names of Philip Artz's two sons. Like the two other witnesses, Ramstrom offered no documentary evidence of the alleged CarMax radio ads.

The defendants did submit documentary evidence of the CarMax mark in the trade context. The defendants offered evidence of their use of the CarMax mark in documents such as customer sales statements, financing documents and secondary sales statements (e.g., powers of attorney, odometer statements). Four witnesses testified that the defendants' Willoughby operation was known and recognized in the trade and automobile dealership community as "CarMax" or "Car-Max, Inc." These witnesses were all involved in some aspect of the car dealer business in Northeast Ohio: Gary Adams, chief executive officer of the Cleveland Automobile Dealer's Association, Charles Price, retired car dealer and president of the Dealer's Association from 1988 to 1994, Michael Berg, owner of Midwest Auto Wholesale, and John Senick, retired financing agent for National City Bank. The defendants also offered uncontradicted testimony that their Willoughby operation was listed as "CarMax, Inc." in the Cleveland Automobile Dealer's Association membership directory in 1992 and 1993 during the relevant time period. The Association distributes the directory to its 160 members as well as the banks and vendors who service the members. In addition, the Association has listed the defendants' business as "CarMax–Lake" in its monthly vehicle registration reports since December 1990.

The record below shows many instances in which the defendants failed to use the Car-Max name in the ordinary course of business. During the relevant time period, for example, there was no listing for CarMax in the phone book, and employees at the Willoughby auto center answered the phone as "Budget" or "AutoCredit" and not CarMax. It was not until mid–1996 that the term CarMax was used to answer phones. The defendants claim that their licensing agreement with Budget prohibited them from using anything but the Budget name to identify the defendants' Willoughby operation over the phone. Furthermore, the defendants' business cards for their Willoughby auto operation also contained the Budget name rather than CarMax. The defendants admitted as well that they never used the CarMax name in any printed advertisements during the relevant time period. Instead, the defendants used the Budget name when advertising their Willoughby operation because they believed that this nationally known name was more powerful than the CarMax name. It was also undisputed at trial that the sign in front of the defendants' Willoughby operation read "Budget" and was not changed to read "CarMax" until 1996. Finally, the defendants did not offer any testimony from ordinary consumers on their association of the defendants' Willoughby operation with the CarMax name. Circuit City, however, submitted a copy of a consumer's complaint filed against the defendants in an unrelated lawsuit in which the defendants' Willoughby operation is referred to as "Budget Car Sales." The consumer brought the complaint against the defendants' used car operation.

The record below also shows that the defendants' franchise agreement with Budget Rent A Car was between AAG, Inc. (i.e., Artz Auto Group) and Budget. In pre-trial discovery, the agreement was produced to Circuit City accompanied by a letter written from Philip Artz to Budget dated December 1, 1990 requesting that Budget replace "AAG, Inc." with "CarMax" on the agreement. Philip Artz later conceded that this letter was not an original and that he had actually created it sometime in February or March 1997. The defendants did not reveal

that the letter was not an original or a copy until the day before the trial was first scheduled to begin. At trial, the defendants offered no evidence that the original December 1, 1990 letter was ever received by Budget.

There was also testimony at trial respecting the defendants' fraud counterclaim against Circuit City. The defendants' counterclaim was based on allegations that Circuit City obtained its federal registration of the CarMax mark through fraudulent means. Section One of the Lanham Act requires registrants to make a verified statement that they are unaware of superior rights to the mark for which they seek registration. *See* 15 U.S.C.A. § 1051(a)(1)(A), (b)(1)(A). A Circuit City officer, Mark O'Neil, made this verified statement in 1993. O'Neil's statement read:

> to the best of [O'Neil's] knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce either in the identical form or in such near resemblance thereto as to be likely when used in connection with the goods or services of such other person to cause confusion or to cause mistake, or to deceive[ ].

The defendants allege that O'Neil's statement was fraudulent because Circuit City was aware of the existence of the defendants' CarMax operation. At trial, O'Neil testified that he was aware at the time he made the verified statement that the defendants were operating a business in Willoughby under the name CarMax d/b/a Budget Rent A Car. Circuit City argued, though, that it had a good faith belief that the defendants' use of the CarMax mark would not cause confusion with its intended use. O'Neil testified that he believed that the defendants' CarMax d/b/a Budget operation was a rental car service and therefore unlikely to cause confusion with Circuit City's use of the mark for its used car business. O'Neil, along with other Circuit City officials, had learned of the defendants' use of the CarMax name in Willoughby through a trademark search conducted by outside counsel. O'Neil testified that it was likely that he spoke to counsel both about the trademark search results and about whether car sales and car rentals were

similar businesses for trademark purposes. O'Neil noted that he "listened" to the advice of counsel and that he made the registration application along with the verified statement because counsel did not advise him not to go forward with the application. The defendants claim that they were prohibited from inquiring into the nature and substance of O'Neil's communications with counsel by Circuit City's invocation of the attorney client privilege. The defendants thus made a motion to strike O'Neil's testimony of his communications with counsel, though the District Court never ruled on it. The defendants did not challenge Circuit City's alleged assertion of attorney-client privilege itself.

With regard to Circuit City's present use of the CarMax mark, testimony at trial showed that Circuit City did not operate any CarMax stores in Ohio. Circuit City projected, though, that it would open CarMax stores in Northeast Ohio by 1999. Circuit City did not introduce any expansion plans, budgets or expansion progress reports into evidence to support this assertion. Trial testimony also showed that Circuit City had made no real estate purchases or hiring efforts in Northeast Ohio in anticipation of its plans to open a CarMax store by 1999. Circuit City did, however, obtain the services of a local real estate broker to identify suitable sites for CarMax stores and had engaged in a comprehensive market analysis of the Northeast Ohio area.

On August 20, 1997, Judge Dowd issued a Judgement Entry and Permanent Injunction against the defendants. The District Court rejected the defendants' affirmative defense of common law ownership because the defendants did not meet their burden of proving actual use of the CarMax mark and secondary meaning. The District Court also rejected the defendants' fraud claim because Circuit City had a good faith belief that it possessed a superior right to the CarMax mark.

## II. ANALYSIS

### A. *The Defendants' Affirmative Defense*

The District Court did not commit reversible error either in its findings of fact or

conclusions of law with respect to the defendants' claim that they were the senior users of the CarMax mark. The defendants claim that the District Court erred both in (1) finding that there was no "independent and convincing evidence" of the frequency of the CarMax radio advertisements during the relevant time period and (2) requiring the defendants to prove that the CarMax mark possessed secondary meaning. We agree with the defendants that the District Court erred in requiring the defendants to prove secondary meaning, but we find that this error was harmless. The evidence before the District Court did not show that the defendants made actual use of the CarMax mark sufficient to warrant a common law right of ownership. The District Court's disregard of the limited evidence of the CarMax radio ads was not clearly erroneous, and the remainder of the evidence before the Court simply was inadequate to establish a senior right to the CarMax mark.

■ 1. *Findings of Fact*—We find no mistake in the District Court's finding that there was no "independent and convincing evidence" of the frequency of the defendants' radio ads for CarMax. The defendants claim that their testimony showed that forty-five to seventy-five CarMax ads were played over the radio every month during the relevant time period. These ads allegedly reached hundreds of thousands of listeners in eighteen counties across Northeast Ohio. The defendants' only evidence of the forty-five to seventy-five monthly rate of radio ads came from the oral testimony of various witnesses. Philip Artz was one of these witnesses. As one of the parties to this lawsuit, Artz was hardly an independent witness. His testimony was far from convincing as well. Artz claimed that he "could make a pretty good guess of how many spots [the Artz Auto Group] had a month" on the following radio stations: WDOK, WMMS, WQAL, WNCX and their AM sister stations. Philip Artz ultimately testified that the number was "probably ... over 300 spots per month," of which fifteen to twenty-five percent (i.e., forty-five to seventy-five) where for CarMax. Artz presented no documentary evidence to buttress his allegations of the volume of CarMax ads on the radio during the relevant

time period. Judge Dowd remarked that he was "left with ... the total absence of any documents that support [Philip Artz's] testimony," thereby leaving him with the "responsibility to weigh and decide [the] credibility" of Artz. Given the fact that Philip Artz had admitted that he fabricated the original copy of the alleged 1990 letter to Budget, Judge Dowd was certainly free to find that Artz was not a credible witness.

It is true that Philip Artz's testimony was supported in part by the testimony of other witnesses, but this alone does not necessarily strengthen the defendants' allegations of the frequency of the CarMax radio ads. Philip Artz testified that the CarMax radio ads were aired over stations WDOK, WMMS, WQAL, WNCX and their AM sister stations. The defendants presented additional testimony only with respect to alleged CarMax ads over WDOK, WMMS and WRMR, WDOK's AM sister station. Like Artz's testimony, the testimony of Tom Embrescia (WDOK) and Gaye Ramstrom (WMMS) was also unsupported by any documentary evidence of the CarMax ads on their radio stations. Both witnesses testified on the frequency of CarMax ads merely from memory. With Embrescia on the stand, Judge Dowd remarked:

> I have credibility to determine in this case ... And what I'm focused on here is that I gather nobody can present me anything in writing or on tapes that established the fact of the use of the name CarMax in the radio advertisement, just people's memory. You don't have any way in your station of demonstrating that there was a 25 percent use of the word CarMax in the commercial. You don't have copies. You don't have transcripts of what was on the commercial. And you don't have the tapes.

Judge Dowd characterized Embrescia's testimony of the frequency of CarMax ads on WDOK (i.e., twenty five percent of 300 monthly ads) as "speculation and estimates." In Ramstrom's case, she admitted herself that she was just "guessing" that the CarMax ads aired anywhere from twelve to twenty times a month on WMMS. Ramstrom also testified that she remembered actually

**1054**

hearing CarMax ads on the radio "five or six times" in 1991 and 1992 and "three times" in 1993. Judge Dowd ruled that this estimate involved her "credibility" as well.

In light of the defendants' effort to fabricate evidence, we cannot say that the District Court erred in deciding that their case was less than persuasive. Without any documentary foundation to their witnesses' testimony, the District Court could only look to the witnesses' credibility for assurances of sincerity. Indeed, the District Court had a duty to "appraise the testimony and demeanor of witnesses." *See United States v. Diapulse Corp.,* 457 F.2d 25, 30 (2d Cir.1972). It did not have a duty, as the defendants urge, to accept the oral testimony of witnesses simply because it was uncontradicted at trial.

■■ 2. *Legal Standard*—The District Court held that the defendants' right to the CarMax mark hinged on whether they could prove that the mark had acquired "secondary meaning" through usage. Secondary meaning is defined as public association of a product or service with a single source [1]—in this case, the defendants' used car operation with the CarMax mark. Proof of "secondary meaning" is required for the protection of marks perceived by the public to be "personal names." *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 13.2 (4th ed.1998). The District Court held that proof of secondary meaning was necessary because CarMax was a personal name since it was "constructed from the names of Philip Artz's children." We disagree.

In *In re Standard Elektrik Lorenz Aktiengesellschaft,* 54 C.C.P.A. 1043, 371 F.2d 870, 873 (1967), the Court held that a composite mark consisting of two personal names is not necessarily a personal name as well. This rule was later elaborated in *In re Hutchinson Technology, Inc.,* 852 F.2d 552, 554 (Fed.Cir.1988) (holding that the issue presented by a composite mark consisting of personal names is "what the purchasing public would think when confronted with the mark as a whole"). No evidence was offered during trial that the public perceives the CarMax mark to be a composite of the names of Philip Artz's two sons, Carson and Max. We believe that the public would view the CarMax mark as connoting something about the sale or service of cars. There is thus no basis to find that the CarMax mark is a personal name in trademark law.

■■ The CarMax mark is more appropriately considered a "suggestive" mark under trademark law. A suggestive mark "suggests ... an ingredient or characteristic of the goods [or services] and requires the observer or listener to use imagination and perception to determine the nature of the goods [or services]." *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 362 (6th Cir.1984). The CarMax mark is "suggestive" because it tells the public that the defendants are involved in the automobile industry but leaves the precise nature of the defendants' business, i.e., sale of used cars, to the consumer's imagination.

■■ A party need only prove "actual use" and not "secondary meaning" to establish common law rights in a suggestive mark. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir.1996). The evidence simply does not show that the defendants made sufficient use of the CarMax mark to establish any rights to it. Rights to service marks are acquired and protected in the same way as rights to trademarks. *See Accuride Int'l, Inc. v. Accuride Corp.,* 871 F.2d 1531, 1534–35 (9th Cir.1989). Rights to trade names are also acquired and protected in the same way as rights to trademarks (and service marks). *See American Steel Foundries v. Robertson,* 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926); *Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.,* 299 F.Supp. 868, 875 (E.D.Mich.1968), *aff'd,* 411 F.2d 792 (6th Cir. 1969).[2] A party establishes a common law

---

1. *See* David E. Rigney, Annotation, *Application of secondary meaning test in action for trademark or tradename infringement under § 43(a) of the Lanham Act,* 86 A.L.R. Fed. 489, 1988 WL 546634 (1988) § [11]2[5(a)] (1988).

2. The defendants argue that they had a senior right to the CarMax mark both as a trade name and a service mark. The defendants thus draw a distinction without a difference for the purposes of this case, and the Court will treat the defen-

right to a trademark only by demonstrating that its use of the mark was "deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1272 (2d Cir.1974).

The most helpful case for the defendants in this Circuit is *Allard Enterprises, Inc. v. Advanced Programming Resources,* 146 F.3d 350 (6th Cir.1998). The Court held that common law ownership of a service mark "may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." *Id.* at 358. The Court found that the defendants successfully established prior ownership rights to a service mark even though the plaintiff had registered the mark with the United States Patent and Trademark Office. The defendants used the service mark at issue in *Allard* to signify an employee placement business. The evidence before the Court showed that the defendants had used the service mark "on at least one fax, on at least one resume, and in numerous [oral] solicitations" during the period before the plaintiff's registration. *Id.* at 359. Although the *Allard* Court found that the defendants' use of the service mark was not "high-volume," it was "consistent and continuous" and thus sufficient to establish a right of prior ownership. *Id.* The Court also recognized that the defendants' use of the service mark was "sufficiently public to qualify for protection" since there was evidence that several large companies (i.e., potential clients of the defendants) associated the mark with the defendants' services. *Id.*

 A close reading of the opinion shows that the *Allard* Court did not abandon the long-standing rule that ownership rights stem only from deliberate and continuous rather than sporadic use of a mark. The *Allard* Court did not point to any evidence showing that the defendants used the mark selectively or that they failed to use it perva-

sively in all their commercial dealings, even if these dealings were low in volume. Furthermore, though the *Allard* Court granted ownership rights to the defendants based only on oral testimony of various "solicitations" and insubstantial documentary evidence of prior use, the Court noted that there was also good evidence of widespread public recognition of the defendants' use of the service mark. Evidence of public recognition is only necessary in cases requiring proof of secondary meaning, but such evidence may be probative of a party's actual use of a mark in cases where secondary meaning is not required. *See id.; see also Florida v. Real Juices, Inc.,* 330 F.Supp. 428, 431 (M.D.Fla.1971) (holding that the plaintiff established a right to a slogan based on evidence of public recognition of its use by the plaintiff). Public recognition is probative of a party's actual use of a mark for the obvious reason that the public cannot be aware of a mark's association with a service or product unless the party has actually used the mark to create this association. Admitting evidence of public recognition also tends to promote trademark law's role in minimizing confusion and deceit concerning products that are publicly associated with a single source.

The *Allard* case has two all important differences with the case now before us. In *Allard,* the Court did not indicate that there was evidence of any material non-use of the service mark by the defendants. In this case, the defendants repeatedly failed to use the CarMax mark in basic commercial contexts such as their telephone listing, store signs, newspaper ads and other customer information. The *Allard* Court also expressly recognized that there was evidence of public awareness of the disputed service mark's association with the defendants' business. The record before us contains no such evidence.

---

dants' various alleged uses of the CarMax mark under the same legal standard.

Circuit City's claim that the defendants must prove secondary meaning to establish rights to the CarMax trade name simply because it is a trade name is a misstatement of the law. The cases do not distinguish between trade names

and trademarks and do not require proof of secondary meaning in cases involving suggestive marks, regardless of whether the mark is defined as a trademark or trade name. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir.1996).

## B. *Evidentiary Ruling*

■ The District Court did not err in refusing to preclude Mark O'Neil's testimony that he consulted with counsel prior to Circuit City's application for federal registration of the CarMax mark. The defendants' argument for preclusion rests on a claim that Circuit City asserted the attorney-client privilege to forbid the defendants from probing further into the communications between O'Neil and counsel. The record fails to show that the defendants were ever precluded by the attorney-client privilege from eliciting evidence at trial of O'Neil's communications with counsel. The defendants' reference to the trial testimony of O'Neil does not show that the District Court allowed Circuit City to withhold evidence of letters between counsel and O'Neil because of the attorney-client privilege. The record before us on appeal reveals that the defendants in fact never requested production of these letters at trial and instead merely demanded the preclusion of Circuit City's testimony based on the supposed assertion of the attorney-client privilege. Since the defendants did not move to request evidence of O'Neil's communications with counsel, there was no basis for the District Court to preclude Circuit City's testimony referring to these communications.

## C. *Injunctive Relief*

■ The District Court properly awarded injunctive relief to Circuit City upon finding that the defendants were liable for trademark infringement and unfair competition. The defendants claim that the District Court erred in awarding injunctive relief because it wrongly found that Circuit City was likely to enter the defendants' Northeast Ohio market in the near future. We conclude that once there is as finding of infringement, as in this case, the District Court was not required to find that Circuit City was about to enter the defendants' market in order to grant injunctive relief. The law of this Circuit holds that no particular finding of likelihood of entry or irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases. *See Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir.1991). The *Wynn* Court noted

that irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from infringement or unfair competition. *Id.* (quoting *Koppers Co. v. Krupp–Koppers GmbH*, 517 F.Supp. 836, 849 (W.D.Pa.1981)). Thus, a court need only find that a defendant is liable for infringement or unfair competition for it to award injunctive relief. The Sixth Circuit has an eight point test for infringement liability under the Lanham Act. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 279 (6th Cir.1997). Likelihood of entry is just one of the eight factors under this test, and it is not dispositive of liability. *See id.* at 287 ("A finding that the parties will not expand their markets significantly ... 'does not address' the ultimate issue of likelihood of confusion"). The District Court found that the defendants were liable for trademark infringement, and its award of injunctive relief was therefore proper.

## III. CONCLUSION

Accordingly, we affirm the District Court's judgment and award of injunctive relief.

NATHANIEL R. JONES, Circuit Judge, concurring.

I join the panel's thoughtful and well-reasoned opinion, but write separately to express my understanding of the decision's effect. In their appeal, the defendants urged this court to apply the *"Dawn Donut* Rule" as articulated in the Second Circuit's decision in *Dawn Donut v. Hart's Food Stores*, 267 F.2d 358 (2d Cir.1959). In that case, the Second Circuit set forth a *per se* rule that there could never be a likelihood of confusion-and an injunction could not be issued— so long as the parties operated in separate and distinct geographical markets, and the senior trademark user had no imminent plans to expand into the infringer's territory. *Id.* at 364. Over time, the *Dawn Donut* Rule gained acceptance in the majority of the circuits. *See, e.g., American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 626 (5th Cir.1963); *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618–19 (3d Cir. 1969); *Mister Donut of America, Inc. v. Mr.*

*Donut, Inc.,* 418 F.2d 838, 844 (9th Cir.1969); *Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1562 & n. 49 (11th Cir.1991); *Minnesota Pet Breeders v. Schell & Kampeter,* 41 F.3d 1242, 1246 (8th Cir.1994); *Lone Star Steakhouse & Saloon v. Alpha of Virginia,* 43 F.3d 922, 931–33 (4th Cir.1995). We, ourselves, once expressed approval of the *Dawn Donut* Rule in dicta. *See Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 157 n. 6 (6th Cir.1973).

However, as section II–C of the panel opinion makes clear, the Sixth Circuit instead employs an eight-point test to assess the likelihood of confusion of two competing marks. The likelihood of entry is but only one factor to be considered in determining whether a senior user is entitled to an injunction. *See, e.g., U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189–90 (6th Cir.1997). We first adopted the eight-point test in *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 648 (6th Cir.1982). Even though *Frisch's Restaurants* did not explicitly reject the *Dawn Donut* Rule, the facts and disposition of that case strongly disfavored a *per se* rule against injunctions when the parties do not compete in the same geographical market. The plaintiff in *Frisch's Restaurants* had the exclusive right to use the contested term "Big Boy" for its restaurant establishments in the state of Ohio, whereas the defendant had the right to use the mark in West Virginia. *Id.* at 644–45. The plaintiff sought relief under the Lanham Act since consumers in Eastern Ohio were allegedly left with the false impression that there was a connection between the plaintiff's and defendant's operations, even though the plaintiff itself did not operate any restaurants in the Eastern Ohio area. *Id.* at 649. Nevertheless, we held that the plaintiff was entitled to an injunction since it otherwise satisfied the eight-point test. Most telling is our holding that "it is evident that [plaintiff] suffers a cognizable injury in this instance because it would have to combat consumer misperceptions about the availability of Big Boy products *if it were to expand into the area itself or license restaurants in that area to operate under the Big Boy trademark." Id.* (emphasis added).

Application of the eight-point test enunciated in *Frisch's Restaurants* to determine the propriety of an injunction makes perfect sense. The trademark laws protect a senior holder from confusing exploitation of its commercial marks. *Yale Elec. Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir.1928) (Learned Hand, J.). If a plaintiff can otherwise demonstrate a likelihood of confusion by a strong showing on the other seven factors, it seems an odd result that the same plaintiff cannot obtain an injunction against an infringer simply because the parties operate in different geographical regions.

The *Dawn Donut* Rule was enunciated in 1959. Entering the new millennium, our society is far more mobile than it was four decades ago. For this reason, and given that recent technological innovations such as the Internet are increasingly deconstructing geographical barriers for marketing purposes, it appears to me that a re-examination of precedents would be timely to determine whether the *Dawn Donut* Rule has outlived its usefulness.