RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0010p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

LFP IP, LLC; L.F.P., INC.; LARRY C. FLYNT,

*Plaintiffs-Appellees,*

*v.*

HUSTLER CINCINNATI, INC.; JIMMY R. FLYNT,

*Defendants-Appellants.*

No. 15-3135

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:09-cv-00913—William O. Bertelsman, District Judge.

Decided and Filed:  January 13, 2016

Before:  GUY, SUTTON, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:**  Robert W. Hojnoski, Carrie M. Starts, REMINGER CO., L.P.A., Cincinnati, Ohio, for Appellants.  Mark A. Vander Laan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellees.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  This appeal marks the latest chapter in a long-running business dispute between two siblings:  Jimmy and Larry Flynt.  At issue is whether the district court erred in modifying a 2011 permanent injunction that prohibited Jimmy (and his associated entities) from using trademarks owned by Larry (and his associated entities), including a trademark featuring their shared last name:  Flynt.  Because the district court appropriately

1

adjusted its injunction to respond to changed circumstances and because trademark law permits one sibling to develop a trademark in a personal name, we affirm.

In 1969, the brothers Flynt opened "The Hustler Club," a bar and nightclub, in Cincinnati. What started as a modest nightclub contained the seeds of a business empire. Before long, Larry created the Hustler enterprise, which grew to become an omnipresent conglomerate that produced sexually explicit magazines and sold adult-themed products. Jimmy worked on and off for the corporation during its expansion, and he opened his own retail store, Hustler Cincinnati, in 2000. That store initially used the "HUSTLER" trademark (which was owned by the Larry-controlled Hustler parent corporation) free of charge, but it began paying licensing fees to the parent company in 2004.

At some point during this period, Jimmy and Larry had a falling out, prompting at least two developments. One: Hustler (owned by Larry) fired Jimmy in 2009. Two: Hustler Cincinnati (owned by Jimmy) stopped paying licensing fees for the HUSTLER trademark but continued to use the mark. That conduct triggered a lawsuit by two of Larry's corporations, which accused Hustler Cincinnati of trademark infringement, unfair competition, and several state-law violations. The district court granted summary judgment to Larry and his entities on the trademark-infringement claims. It then issued a permanent injunction that prohibited Jimmy and his companies from "using in commerce any HUSTLER trademark" and "using any trademark or any variation thereof owned by" Larry or his corporations. R. 204 at 1–2.

Our court affirmed the injunction. *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 621–22 (6th Cir. 2013).

After that decision, Larry and his companies filed a motion in the district court complaining that Jimmy had opened a new retail store in Florence, Kentucky, marketed under the name "FLYNT Sexy Gifts." R. 249 at 3. They argued that this marketing campaign infringed their "LARRY FLYNT" trademark and that Jimmy should be held in contempt for violating the injunction. The district court denied the contempt motion, finding that the injunction did not directly prohibit Jimmy's conduct at the Florence store. But the court suggested that it would be open to a request to modify the injunction.

Picking up on the cue, Larry and his corporations filed a motion to change the scope of the injunction. The court conducted an evidentiary hearing. It then granted the motion, reasoning that Jimmy's use of "FLYNT Sexy Gifts" was "likely to cause confusion with the LARRY FLYNT trademark." R. 272 at 13. The court modified its earlier injunction to prevent Jimmy and his companies from "[u]sing the name 'Flynt' in connection with the sale, promotion or advertising of adult entertainment products or services unless it is accompanied by the first name 'Jimmy' in the same font size, color, and style and on the same background color." *Id.* The district court also required Jimmy, when using the name "Flynt" anywhere except on "store signage," to incorporate "a conspicuous disclaimer stating that the goods or services are not 'sponsored, endorsed by, or affiliated with Larry Flynt or Hustler, or any business enterprise owned or controlled by Larry Flynt.'" *Id.* Jimmy appealed.

Courts have long held the power to modify injunctions, whether to narrow or broaden them. Injunctions frequently demand "continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Employees' Dep't v. Wright*, 364 U.S. 642, 647 (1961). Courts thus may exercise their "sound judicial discretion" to modify an injunction "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Id.* That does not mean that the parties may duel and re-duel over the merits of the original injunction, *see id.*, a not insignificant caveat in the context of a lawsuit spanning six years and a sibling relationship ruptured longer ago than that. It does mean, however, that the parties may receive modified relief when "the original purposes of the injunction are not being fulfilled in any material respect." 11A Charles Alan Wright et al., Federal Practice & Procedure § 2961 (3d ed. 2015); *see United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248–49, 252 (1968).

The district court amply justified its modification to the injunction. The court found that the facts on the ground shifted when Jimmy opened a new store and marketed it under the name "FLYNT Sexy Gifts." In particular, it found that Jimmy placed a sign in front of the store that said "FLYNT Sexy Gifts" (with the name "Jimmy" written in barely visible font nearby), created a website at www.flyntsexygifts.com, and printed the phrase "FLYNT SEXY GIFTS" on

receipts issued at the Florence location.  R. 272 at 6–7.  The court then applied the traditional test for trademark infringement under federal law, asking whether (1) Larry and his companies owned the LARRY FLYNT trademark, (2) Jimmy "used the mark in commerce," and (3) "the use was likely to cause confusion."  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).  The court found all three elements satisfied, noting that Jimmy's marketing scheme would likely mislead consumers into thinking that the Florence store was associated with Larry, the Hustler empire's public figurehead.  Because the original injunction was tailored to prevent trademark infringement by Jimmy's corporations, and because Jimmy had committed new violations, the district court acted appropriately when it modified its initial grant of relief to cover Jimmy's conduct at the Florence outlet.

The district court's modified injunction was also "suitably tailored to the changed circumstance[s]."  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992).  Balancing the competing interests of Larry and Jimmy, the court permitted Jimmy to use his full name while protecting Larry's interest in the LARRY FLYNT trademark.  Even the disclaimer requirement, burdensome though it may be, accounted for each side's interests by exempting store signage from the requirement.  The court's injunction, as it happens, mirrors an injunction entered by another federal court in related family-based litigation between Jimmy's sons and Larry.  *Flynt v. Flynt Media Corp.*, No. 2:09-cv-00048-AHM-RZx, slip op. at 2–5 (C.D. Cal. Dec. 28, 2009).

The modified injunction also accounts for one other feature of this litigation:  that Jimmy seeks to use *his own* last name.  Courts, it is true, are "reluctan[t]" to prevent individuals from using their own surnames in business.  *E.g.*, *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 (9th Cir. 1992); *see also* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 13:9 (4th ed. 2015).  But just as trademark law protects one business and its marks from sharp practices by unrelated businesses, it must do the same for related businesses—when one family member tries to sow confusion in the marketplace over the source and goodwill of a product by using a mark that another family member has created and developed.  While one might think this problem arises where you least expect it, the reality is otherwise.  Sibling and other family rivalries have generated all manner of trademark disputes over the use of a shared last name.  *See, e.g.*, *Joseph Scott Co. v. Scott Swimming Pools, Inc.*,

764 F.2d 62, 63–64 (2d Cir. 1985); *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 814–18 (3d Cir. 2006); *E. & J. Gallo Winery*, 967 F.2d at 1283–86; *Friend v. H.A. Friend & Co.*, 416 F.2d 526, 528–29 (9th Cir. 1969); *Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916, 917–20 (S.D.N.Y. 1988). As these cases demonstrate, the trademark laws do not prevent parties from receiving trademark protection for personal names. *See Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054 (6th Cir. 1999); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 988–90 (7th Cir. 2004).

The caselaw in this area instead reflects two imperatives: (1) that the court finds that the traditional requirements for unfair competition through the use of another's trademark have been established (typically including the requirement that the name acquired a "secondary meaning" as a result of its association with the relevant products, *see Circuit City Stores*, 165 F.3d at 1054), and (2) that the scope of the injunction accounts for the reality that the mark relates to the offending party's own last name. *See, e.g.*, *Joseph Scott*, 764 F.2d at 65 n.2, 69 (stating, in modifying the district court's preliminary injunction, that an individual "should be permitted to use his name to describe his past accomplishments and expertise," but that "he must make perfectly clear that his firm is no longer associated with, and is not a successor to," a competing corporation); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 736 (2d Cir. 1978) (holding that an individual may "use his signature" on certain "label[s] or advertisement[s] if he chooses, but only with appropriate disclaimer that he is not connected with, or a successor to," a competing corporation); *Berghoff Restaurant Co. v. Lewis W. Berghoff, Inc.*, 499 F.2d 1183, 1185–86 (7th Cir. 1974) (affirming the district court's "carefully tailored" injunction, which required the defendant, when using his last name in connection with a restaurant, to include his first name in equal-sized lettering and to incorporate a disclaimer); *E. & J. Gallo Winery*, 967 F.2d at 1289, 1296–98 (affirming, with modifications, an injunction that "limit[ed] the use of [a party's] name only to the extent necessary to avoid public confusion"); *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 725–26 (9th Cir. 1985) (affirming a district court order that permitted the defendant to continue using his name in a restaurant's title, but only if he posted notices "disclaiming any connection with" a similarly named New York restaurant); *see also* 2 McCarthy, McCarthy on Trademarks and Unfair Competition §§ 13:1, 13:9. Consistent with this body of caselaw, the district court carefully crafted its injunction to respond to Jimmy's

conduct at the Florence location, and the injunction targets the specific actions that gave rise to its modification. *See* Fed. R. Civ. P. 65(d). To the extent Jimmy remains interested in using *his* name, the modified injunction allows him to do just that: He can still give the store, any website, or other products the mark "Jimmy Flynt."

Jimmy challenges the court's modified injunction in two other ways. He claims that the district court applied the wrong standard, arguing that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead" to a modified injunction. *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932). But since announcing the "grievous wrong" standard, the Supreme Court has gone to great lengths to walk it back. The Court warned against according the "'grievous wrong' language . . . a talismanic quality," *Rufo*, 502 U.S. at 380, and stated that this phrase "must be read in the context of the [specific] continuing danger" that the Court addressed in *Swift*, which first announced the "grievous wrong" standard, *Bd. of Educ. v. Dowell*, 498 U.S. 237, 247 (1991). In *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 251 (1968), moreover, the Court clarified that district courts may modify an injunction that is not "achiev[ing] its 'principal objects,'" reversing a decision that applied the *Swift* standard too rigidly. In today's case, the district court took the Supreme Court's guidance to heart, appropriately assessing whether changed facts required modified relief rather than leaning too heavily on *Swift*'s "grievous wrong" rhetoric.

Jimmy also takes issue with some of the factual findings that the district court used to justify the modified injunction. He claims that *he*, not Larry, first used the "Flynt" surname to market retail goods. To buttress the point, he notes that, when Larry's company registered the LARRY FLYNT trademark, it indicated its intent to use the mark on "pre-recorded digital video disks," "downloadable films," and "television programs," not on retail products like those sold at Jimmy's outlet. R. 258-4 at 1. And when Larry's company *did* try to register the name "FLYNT" for use in retail stores, its application was denied (and subsequently abandoned). Jimmy also claims that there is no evidence of genuine "consumer confusion" related to the ownership of the Florence store, which means Larry and his companies cannot make out a valid trademark-infringement claim. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

But none of the district court's factual findings is clearly erroneous. *See Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). Although Larry *registered* the LARRY FLYNT mark for use on films and DVDs, he presented evidence that he *used* the mark in connection with a wide range of "adult entertainment products," including the kinds of products sold at Jimmy's store. R. 272 at 12. Because product use, rather than product-related registration, marks the salient indicator of ownership in trademark-infringement actions, *see Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991), the district court reasonably found that Larry and his corporations owned the LARRY FLYNT trademark with respect to retail goods. The court also reasonably found that Larry began using the mark on adult entertainment products before Jimmy did. It supported this point by referring to the testimony of Jimmy himself, who stated that the Hustler enterprise "always used Larry Flynt, the publisher of Hustler, as a promotion in any event." R. 268 at 67. And the fact that Larry's company abandoned the FLYNT trademark application does not mean that it abandoned the LARRY FLYNT mark for retail products—as long as it continued to use that mark in commerce, which it did. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 816–17 (1st Cir. 1987); *see also* 37 C.F.R. § 2.68(b). The district court thus did not err in concluding that Larry and his corporations had trademark rights in the LARRY FLYNT mark for use in adult-themed retail stores.

In claiming an absence of evidence of consumer confusion, Jimmy missteps. Some of the evidence comes from Jimmy himself. When asked about "instances where a consumer has been confused, in terms of whether or not [Jimmy was] the owner of th[e] store," Jimmy responded, "I have experienced the confusion in the names, you know. Jimmy and Larry Flynt, in this market area, is somewhat synonymous with Hustler or with Flynt. You're not going to get around that." R. 268 at 71. Alec Helmy, who owns a news organization that reports on the adult entertainment industry, also testified that, if he saw the "FLYNT Sexy Gifts" sign, he would assume that Larry owned the store. Based on this testimony, the district court fairly concluded that Jimmy's marketing campaign was likely to cause confusion among consumers, and it fairly modified the injunction to respond to that possibility.

For these reasons, we affirm.