HOLIDAY INNS OF AMERICA, INC.

v.

B & B CORPORATION; EMILE A. BERNE, GERALD L. BERNE; & ANTHONY BLISS

B & B CORPORATION; EMILE A. BERNE; and GERALD L. BERNE, Appellants

## No. 17,199

### United States Court of Appeals

Third Circuit

Argued January 30, 1969
Decided April 10, 1969

*See, also, 409 F.2d 614*

CROXTON WILLIAMS, ESQ., Charlotte Amalie, St. Thomas, Virgin Islands, *for appellant*

MASON, FENWICK & LAWRENCE, Washington, D.C. (JAMES L. KURTZ, ESQ., for counsel) *for appellee*

46

Before FREEDMAN, VAN DUSEN and ALDISERT, *Circuit Judges*

## OPINION OF THE COURT

ALDISERT, *Circuit Judge*

In 1954 the service mark "Holiday Inn" was registered in the United States Patent Office by the Holiday Inns of America, Inc. (Holiday).[1] Since 1961, the appellants, who are not associated with Holiday in any respect, have operated a sixteen-room motel in Charlotte Amalie, St. Thomas, Virgin Islands, under the name of "Holiday Inn" and "Holiday Inn of St. Thomas".[2]

Relying on the protection afforded by its registration under the Trademark Act of 1946 (Lanham Act)[3] and the tort law of unfair competition, Holiday instituted an action to restrain the use of the service marks "Holiday Inn" and "Holiday Inn of St. Thomas" by the appellants.[4]

---

[1] "For: Motel services—Namely, providing lodgings and meals in motels— in class 100. First used Mar. 1, 1952, and in commerce July 1, 1952." The registration was authorized by the Trademark Act of 1946, 15 U.S.C.A. § 1051. The term "service mark" means "a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." 15 U.S.C.A. § 1127. The legal effect of service mark registration is identical to that of trademark registration.

[2] There was no allegation that appellants have adopted graphic symbols or logotypes which are confusingly similar to those used by the Holiday Inn chain.

[3] 15 U.S.C.A. § 1114(1) provides, in part:
"Any person who shall, without the consent of the registrant—
   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

\*          \*          \*

shall be liable in a civil action by the registrant for the remedies hereinafter provided."
15 U.S.C.A. § 1072:
"Registration of a mark on the principal register provided by this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof."

[4] Jurisdiction of the District Court to hear the action was based on 15 U.S.C.A. § 1121 and 28 U.S.C.A. §§ 1331, 1332, 1338 and 1391.

The District Court concluded that Holiday had established a superior right to the use of the marks, granted summary judgment in its favor, and enjoined the appellants from utilizing the service marks in the future. We have no difficulty in accepting this conclusion. The record before the court, consisting of extensive and detailed pleadings, depositions, interrogatories and affidavits, indicates not only that Holiday had registered its claim of ownership of the mark six years before the defendant began to use it, but also that it actively and aggressively featured the registered mark as a symbol of nationally uniform, high quality motel services.

At the time appellants' St. Thomas motel was opened in early 1961, Holiday had already established its national reputation. It was then operating over 150 motels and was rapidly expanding.[5] By the time of the proceedings in the court below, it had grown to an international complex of some 830 motels, either directly owned or franchised by Holiday, which exercised strict control over the nature and quality of the services offered to the public under its name.

Its centrally controlled chain of motels featured a computer system which linked every motel with a reservation center providing instantaneous room-availability information for each unit throughout its entire network. Advertising and promotional campaigns created an identifiable public image for "Holiday Inn" throughout the United States, possibly conferring upon these words a secondary meaning that a motel bearing this label was in fact owned or operated by Holiday as part of its chain.[6]

---

[5] Room revenue and food and beverage sales of Holiday Inns of America, Inc., have increased from $7,000,000.00 in 1960 to $63,000,000.00 in 1967. Expenditures for national advertising and business promotion have increased from $172,000.00 in 1960 to over $2,000,000.00 in 1966. Expenditures for local advertising and business promotion increased from $270,000.00 in 1960 to $3,000,000.00 in 1966.

[6] Holiday Inns of America, Inc. v. Mullen's Holiday Inn, Inc., 292 F.Supp. 755, 756 (E.D. Calif. 1968).

It cannot be seriously disputed that Holiday demonstrated its superior interest in the service name even without a registration under the Lanham Act, which, under the present record, must control the disposition of the conflicting claims to the use of the mark.

In Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3 Cir. 1958), a case not governed by federal trademark legislation, we recognized the rights and priorities which attached to the use of a trade name or mark. In reviewing the controlling principles which have guided the courts in the enforcement of these rights, we relied upon Judge Learned Hand's characterization:

"His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."[7]

■ The genesis of the Lanham Act was the common law expression of unfair competition so eloquently articulated by Judge Hand, with an additional emphasis on consumer protection. Its objective has been stated as "the protection of trademarks, securing to the owner the good will of his business and protecting the public against spurious and falsely marked goods",[8] and to achieve this ob-

---

[7] Yale Elec. Corp. v. Robertson, 26 F.2d 972, 974 (2 Cir. 1928).

[8] S.Rep. No. 1333, 79th Cong., 2d Sess. 1 (1946), U.S.Code Serv. 1946, p. 1274; Franchise Stores of New York, Inc. v. Winter, 394 F.2d 664, 668 (2 Cir. 1968). "The evil sought to be remedied in the trademark infringement action is that of 'passing off—the sale of another's goods as those of the trademark owner by use of the owner's mark'." "Developments in the Law, Trade-Marks and Unfair Competition, 68 Harv. L.Rev. 814, 818 (1955)." See also Family Circle, Inc. v. Family Circle Associates, Inc., 332 F.2d 534, 539 (3 Cir. 1964); Kelley Girl Service, Inc. v. Roberts, 243 F.Supp. 225, 227 (E.D. La. 1965).

jective it devised a statutory litmus paper to test for the presence of infringement.[9]

■ Prior to Congressional intervention in this field, the presence of infringement was determined, in most cases, by a balancing of two conflicting interests: that of the owner of the mark to prevent diversion of prospective customers as opposed to that of the putative infringer to be free to compete for them.[10] There can be no question that the passage of the Lanham Act made possible a more facile resolution of infringement questions.

■ But the prior authorized registration of a service mark by one, albeit coupled with an improper use by another, does not justify *per se* the precise injunctive relief granted by the District Court. The record before it, confined by the device of a summary judgment proceeding and devoid of supporting evidence showing a common law debasement of the protected name,[11] limits the granting of the injunction to a situation where there is proof that the use was likely "to cause confusion, or to cause mistake, or to deceive". Any evidence of present confusion was, at best, scanty, consisting solely of some statements in a deposition of one of the defendants that certain conversations with guests and correspondence, totalling about twelve occasions in one year, disclosed an impression that defendants' operation was affiliated with the Holiday chain. Because the appropriate test is a likelihood of, rather than actual, confusion, Holiday has been willing to rest its case on the proposition that the use of the identical mark "Hol-

---

[9] 15 U.S.C.A. § 1114(1): "Any person who shall, without the consent of the registrant—(a) use in commerce . . . a registered mark . . . which . . . is likely to cause confusion, or to cause mistake or to deceive. . . ."

[10] American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560 (2 Cir. 1953).

[11] Cf. Travelodge Corp. v. Siragusa, 228 F.Supp. 238 (N.D. Ala. 1964) aff'd 352 F.2d 516 (5 Cir. 1965), where there was substantial evidence supporting the conclusion that the defendant's inferior motel services would create irreparable harm to plaintiff.

iday Inn" upon identical services in itself establishes such a likelihood thereby qualifying it for the injunctive relief afforded by the statute.[12]

█ We could accept this proposition if it had been accompanied by proof of an additional factor: that the identical names are at large in the same market place to compete for the same customers. The purpose of the law of trademark infringement is not to afford relief against unfair business conduct *in vacuo*; it is designed solely to prevent unfair competition.

· Holiday at present is not operating in the Virgin Islands. It professes an intention to commence construction and operations here at some time in the future, but it has not yet done so. Its nearest motel is located in San Juan, Puerto Rico, some seventy miles across the sea.

With the development of today's mobile society, capable of many changes of domiciles, frequently utilizing as sources of retail services business establishments which are located hundreds, if not thousands, of miles from these domiciles, and generally relying on or being influenced by nationally-conducted advertising campaigns, there has been a corresponding diminution of older concepts that retail. services are conducted in restricted or local marketing and trading areas. So instant is our communication and so efficient our transportation that it can be said that the American market place for most nationally advertised products is the entire United States. In most retail product situations, then, the question of competition within the same market or trading area is not, ordinarily, a point of much disputation.

---

[12] See American Plan Corp. v. State Loan & Finance Corp., 365 F.2d 635, 639 (3 Cir. 1966): "Where the names are identical . . . the names in themselves are evidence of likelihood of confusion." Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp., 109 F.2d 35 (D.C. Cir. 1939); American Steel Foundries v. Robertson, 269 U.S. 377 (1926); Baker v. Simmons Co., 307 F.2d 458 (1 Cir. 1962).

Where motel services are concerned, however, this is not an insignificant consideration. At least it was not deemed insignificant by a licensee of Holiday in Pennsylvania defending a trademark infringement action brought by a prior user of the name "Holiday" in the motel business. Holiday's licensee was able to convince the Pennsylvania Supreme Court in Zimmerman v. B. & C. Motel Corporation, 401 Pa. 278, 163 A.2d 884 (1960) that Holiday should not be enjoined from using the mark for the reason that Holiday and the plaintiff, being located seventy-five miles apart, were not in the same marketing or trading area. The court observed:

"The complaint being one of unfair competition, the question is whether the parties are competing in the same market, and, if they are, whether plaintiff has a position that he can defend against invaders.

"There come at once the many National, Grand, Palace, Congress, Station, Railroad, Ambassador, and Mayflower Hotels that dot the nation, and it is likely that the public does not confuse them because the effective distinction is one of locality."

\*　　　\*　　　\*

"[T]he parties are not operating in the same market. The motels in question are too far apart for realistic competition. . . ." 163 A.2d at 887.

We have decided that Holiday has superior rights to the trade or service mark, at least against the appellants, that it had registered a claim of ownership some years before its use was borrowed, and that the borrowed use was improper. But we are also aware of the unusual geographic setting of the Virgin Islands, to which one arrives by ship or plane and not by turnpike. The islands are over a thousand miles east of the mainland operation of the Holiday chain and are separated by seventy miles of sea from the nearest West Indies unit.

■ We must protect that which is protectable, but, in so doing, we must limit the use of injunctive relief to situ-

ations where it is necessary to prevent immediate and irreparable injury. The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law.[13]

An additional complication is our conclusion that the identity of the competing marks will certainly cause confusion if and when Holiday commences operations in the Virgin Islands. In the event of such expansion into this specific island territory, appellants, already the beneficiary of Holiday's concentrated national and international advertising campaign, would, through an unauthorized use of a statutorily-protected identical trade name, be likely to deceive or create confusion as to the source, origin, and type[14] of motel services being offered to the public.

■ Nevertheless, Holiday had no right to immediate relief because it failed to present sufficient evidence of present debasement of its protected mark, and although it established a strong case of a future likelihood of confusion if and when the identical marks would begin to compete in the same market area for identical services, the geographic location of these islands militates against a finding that there is a use by the defendants of that type

[13] We recognize that some courts have interpreted the Lanham Act to afford protection to registered owners of service marks involving certain retail products and services upon a showing of a likelihood that the registrant will expand his use into the appellants' market even though there is no present competition in the same market. Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 364 (2 Cir. 1959); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 626 (5 Cir. 1963); John R. Thompson Co. v. Holloway, 366 F.2d 108, 114–15 (5 Cir. 1966); Kelley Girl Service, Inc. v. Roberts, supra n. 8; Villager, Inc. v. Dial Shoe Co., 256 F.Supp. 694 (E.D. Pa. 1966); Quality Courts United v. Quality Courts, 140 F.Supp. 341 (M.D. Pa. 1956).

[14] For example, each motel in the Holiday Inn chain must offer the following comforts and conveniences to its patrons: year-round air conditioning; swimming pool; free advance reservations; telephone in each room; meeting facilities; baby sitters; house physicians; baby beds; a food service; valet and laundry service; all-tile baths; televisions; free kennels and free ice.

of competitive commerce envisioned by Congress. Holiday has received two franchise applications and a request for the availability of a franchise for the operation of Holiday Inn motels in the U.S. Virgin Islands. At oral argument its counsel represented that these applications are being reserved until this litigation is determined.[15] Because we have decided that if and when Holiday does commence such operations there will be a likelihood of public confusion, it would then be entitled to the relief granted by the district court.

Accordingly, we will affirm the judgment of the district court, subject to the direction that the decree be modified to permit injunctive relief, as of course, upon a showing that Holiday actually has begun the development or construction of a motel in the U.S. Virgin Islands.

---

[15] At oral argument counsel indicated also that appellee would be satisfied with a modification of the order for immediate injunction which was issued by the district court. In a supplemental brief supplied after the oral argument, he stated that the record "does support an affirmance with a slight modification to such decision—such modification being that judgment becomes operative after the plaintiff commences construction of a motel in the Virgin Islands. There is ample support for such. [Citing Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2 Cir. 1959); John R. Thompson Co. v. Holloway, 366 F.2d 108 (5 Cir. 1966).]"