**MEMBERS FIRST FEDERAL CREDIT UNION,**
Plaintiff,

v.

**MEMBERS 1ST FEDERAL CREDIT UNION, Defendant.**

**No. Civ.A. 1:CV-96-2210.**

United States District Court, M.D. Pennsylvania.

April 23, 1999.

Lewis F. Gould, Jr., Steele, Gould & Fried, Philadelphia, PA, Andrew H. Cline, David R. Fine, Kirkpatrick & Lockhart, Harrisburg, PA, Donald L. Cox, Mary Janice Lintner, Lynch, Cox, Gilman & Mahan, P.S.C., Louisville, KY, for plaintiff.

Harvey Freedenberg, Franklin A. Miles, Jr., Marc J. Farrell, Randolph B. Houston, Jr., McNees, Wallace & Nurick, Harrisburg, PA, for defendant.

### MEMORANDUM

RAMBO, Chief Judge.

Before the court are the following motions: (1) Plaintiff's motion for partial summary judgment and a permanent injunction; (2) Defendant's motion for summary judgment; and (3) Plaintiff's supplemental motion for partial summary judgment. The parties have briefed the issues, and the motions are ripe for disposition.

### I. Background

The captioned case is an action for service mark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114–1150; 54 Pa.Cons.Stat.Ann. § 1124; and the common law. Plaintiff Members First Federal Credit Union ("Members First") instituted the action on December 23, 1996. Named as Defendant in the action is Members 1st Federal Credit Union ("Members 1st"). The following facts are undisputed, except where noted:

Members First is a federal credit union that operates under the trade name and service mark "Members First" and/or "Members First Federal Credit Union." Its main office and headquarters are located in Louisville, Kentucky, with branch offices in Belle, West Virginia and Towanda, Pennsylvania. It has members in at least eighteen states in the United States, as well as in foreign countries overseas. Members First has approximately 900 members in Pennsylvania.

Chartered as a credit union in 1966, Members First was originally known as "LWE Federal Credit Union." It opened its Belle, West Virginia office in 1982 and its Towanda, Pennsylvania office in 1983. In January 1985, the National Credit Union Administration ("NCUA") approved Members First's adoption and use of the name "Members First Federal Credit Union." Members First has used in interstate commerce, and operated in Pennsylvania under, the same name continuously since January 28, 1985.

Members First uses the following service mark: two interlocking ovals, one solid and one lined, with the words "Members First" printed on the solid oval and the words "Federal Credit Union" printed below the interlocking ovals. On August 17, 1994, Members First filed an application with the United States Patent and Trademark Office to register its service mark for use in connection with financial services and related services that may be offered by federally-chartered credit unions to serve the financial needs of the membership, including, but not limited to: loans (consumer, commercial, and real estate); savings accounts; demand accounts; certificates of deposit; insurance; and other support services and products. The United States Patent and Trademark Office granted the application on February 27, 1996, giving Members First U.S. Registration No. 1, 958, 454. The registration disclaimed the words "Federal Credit Union" apart from the mark as shown. Members First uses its service mark on all forms of

instruments, papers, writings, legal documents, blanks, forms, and other business and financial documents. It also uses the mark on its automated teller machine ("ATM") cards, credit cards, and ATM's, which are open to use by customers of other financial institutions in the ATM system.

Members First presently has approximately twelve select employee groups ("SEG") within its field of membership.[1] It has no SEG's affiliated with, or located near, its Belle, West Virginia office, four SEG's affiliated with its Towanda, Pennsylvania office,[2] and the remainder affiliated with and located near its Louisville, Kentucky office. The four SEG's affiliated with its Towanda office are located in, or within twenty-five miles of, Towanda, Pennsylvania. Members First has not added any SEG's to its field of membership in the Towanda, Pennsylvania area, and thus, in Pennsylvania, since 1986 or 1987.[3]

Defendant Members 1st is a federal credit union that operates under the trade name and service mark "Members 1st" and/or "Members 1st Federal Credit Union." Its main office and headquarters are located in Mechanicsburg, Pennsylvania. Members 1st obtained its charter in 1950 and was known as NSD Mechanicsburg Federal Credit Union. In 1972, it changed its name from NSD Mechanicsburg Federal Credit Union to Defense Activities Federal Credit Union ("DAFCU"). In 1994, prior to the filing of Members First's service mark registration application, DAFCU changed its name to Members 1st Federal Credit Union.

Prior to the second name change, Robert Gentry, Vice President of Marketing at DAFCU, proposed the name change to DAFCU's Board of Directors who approved the change.[4] Gentry then proposed the name change to the NCUA, the federal agency that regulates credit unions. According to Gentry, the NCUA informed him that there were "other credit unions using that name in the country and we could not approve the name as such for you." In January or February 1994, Gentry learned that a credit union in Pennsylvania was operating under the name "Members First." At the same time, he was also aware that a federal credit union was using the name "Members First Federal Credit Union."[5] On April 11, 1994,

1. These SEG's include E.I. DuPont DeNemours & Co., Memorial Hospital, Inc.; Skilled Nursing Union; Joe Guy Hagan, Realtors; Southeast Service Corporation; Medley Construction, Inc.; H.L. Lyons Co.; Excel Logistics; Stewart Services, Inc.; Stigler Construction Co., Inc.; and Raytheon Engineers & Constructors.

2. The four SEG's are E.I. DuPont DeNemours & Co.; Memorial Hospital, Inc.; the Williams Companies; and Northern Tier Regional Planning Commission.

3. The parties dispute Members First's plans for expansion: Members 1st asserts that Members First's charter restricts it from adding new SEG's that are located more than twenty-five miles from one of its branch offices. (Member 1st's Stmt. of Undisp.Mat. Facts ("Members 1st's Stmt.") ¶ 19.) It also contends that Members First has no plans for expansion to other locations or for the establishment of additional branch offices. (Id. ¶ 22.) In contrast, Members First claims that Members 1st is misinterpreting its charter and expansion rights under federal law.

(Members First's Counterstmt. of Undisp.Mat. Facts ("Members First's Counterstmt") ¶ 7.) Furthermore, Members First claims that the deposition on which Members 1st bases this assertion was taken before the enactment of legislation that materially impacted Members First's plans for expansion. (Id. ¶ 10.)

4. The parties stipulate that Gentry "is the person who is and was the most familiar with [Members 1st's] knowledge, on or before, August 17, 1994, of the existence of [Members First] and/or of any credit unions operating under a name identical or similar to 'Members First' or 'Members 1st.'" (Stipulation filed Feb. 9, 1999 ¶ 1.) The parties further stipulate that no other person, either currently or formerly employed by Members 1st, possesses more or different information than Gentry regarding the issue of Members 1st's knowledge of Members First. (Id. ¶ 3.)

5. The parties dispute whether Gentry knew that the "Members First" credit union was affiliated with or the same as the "Members First Federal Credit Union." (Members

DAFCU changed its name to Members 1st Federal Credit Union. Members 1st utilizes a service mark that consists of the word "Members," followed by a numeral 1 and the superscripted letters "st." The words "Federal Credit Union" appear below the word "Members." [6]

In addition to its main office in Mechanicsburg, Pennsylvania, Members 1st has nine branch offices in Pennsylvania: two in Carlisle; two in Camp Hill; two in Harrisburg; and three in Mechanicsburg. It has 210 SEG's, all of whom are located in central Pennsylvania. Members 1st does, however, have individual members who reside outside the central Pennsylvania region. Its members may be employed by a subsidiary of an SEG which is located in a state other than Pennsylvania. The employees of a subsidiary of an SEG are also eligible for membership in Members 1st.[7]

In addition to their memberships in the National Association of Federal Credit Unions, both Members First and Members 1st offer mortgages, personal property loans, VISA credit cards, ATM cards, and insurance policies. In addition, Members 1st offers telephone banking, and Members First allegedly intends to offer the same in the near future. (Members 1st's Counterstmt. of Undisp.Mat. Facts ("Members 1st's Counterstmt.") ¶ 45.) [8] Both parties also use the radio and newspaper media to advertise their services. Towanda, where Members First's sole

Pennsylvania branch office is located, is approximately 151 from Mechanicsburg, 173 miles from Camp Hill, 143 miles from Harrisburg, and 160 miles from Carlisle, Pennsylvania, the sites of Members 1st's branch offices. According Members 1st, it has a five-year strategic plan which includes the addition of four or five branch offices in Cumberland County, Pennsylvania and/or the counties contiguous thereto.[9]

On December 23, 1996, Members First filed a complaint for equitable and monetary relief. It then filed an amended complaint on January 21, 1997. By order dated March 30, 1998, the court placed the matter on its February 1999 trial list. On September 29, 1998, Members 1st filed a motion for leave to amend its answer to the amended complaint. Prior to the completion of briefing of the motion, the parties filed the instant cross-motions for summary judgment on October 15, 1998, in accordance with the deadlines set forth in the court's March 30, 1998 order.[10] On December 31, 1998, the court granted Members 1st leave to amend its answer to assert an additional defense. By the same order, the court: (1) permitted the parties to reopen discovery with respect to only those issues raised by Members 1st's new defense; (2) granted them leave to supplement their motions for summary judgment; and (3) continued the trial until

First's Stmt. of Undisp.Mat. Facts ("Members First's Stmt.") ¶ 11; Members 1st's Counterstmt. of Undisp.Mat. Facts ("Members 1st's Counterstmt.") ¶ 11.)

6. Members First disputes Members 1st's contention that it uses a "stylized" form of its mark, alleging that Members 1st often represents its service mark without any stylization. (Members 1st's Stmt. ¶ 26; Members First's Counterstmt. ¶ 13.) Members First, however, does not cite to any document or exhibit in support of its response.

7. For example, Giant Foods is in Members 1st's field of membership; as such, wherever Giant Foods has a store, its employees are eligible for membership.

8. Without specification, Members 1st also alleges that it offers some services not offered by Members First. (Members 1st's Counterstmt. ¶ 45.)

9. Members First also itemizes numerous alleged instances of actual confusion of the parties' marks in its Statement of Undisputed Material Facts, some of which Members 1st does, however, dispute, in varying degrees. (Members First's Stmt. ¶¶ 17–44; Members 1st's Counterstmt. ¶¶ 17–44.)

10. As indicated above, Members First sought only partial summary judgment and a permanent injunction, while Members 1st moved for summary judgment on all counts.

May 1999. On February 25, 1999, Members First filed the supplemental motion for partial summary judgment also currently before the court.

## II. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *See id.* at 249, 106 S.Ct. 2505. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *See White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Summary judgment should be granted where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of persuasion at trial. *See id.*

## III. *Discussion*

As previously discussed, supra Part I, this case presents claims for service mark infringement under the Lanham Act, 15 U.S.C. §§ 1114–1150. In its motion for summary judgment, Members 1st argues that it is entitled to summary judgment on all claims because Members First has not shown a likelihood of entry into the market area currently occupied by Members 1st. Members First, in its own motion for partial summary judgment, argues that the record demonstrates a likelihood of confusion of the parties' marks and thus, the court should permanently enjoin Members 1st's use of its allegedly infringing mark. In its supplemental motion for partial summary judgment, it further argues that Members 1st is not entitled to assert the "limited area" defense. The court will first address Members 1st's motion for summary judgment; then, it will turn to Members First's motion for partial summary judgment and permanent injunctive relief; finally, the court will resolve Members First's supplemental motion for partial summary judgment.

### A. *Members 1st's Motion for Summary Judgment*

Simply put, "[t]he law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983). "To prove trademark infringement, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). With the passage of the Lanham Act in 1946, Congress federalized the common law protection given to trademarks and service marks used in interstate and foreign com-

merce.[11] Pursuant to the Lanham Act, federal registration of a mark constitutes *prima facie* evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce, subject to any common law or equitable defenses which would be otherwise assertible if the mark was unregistered. *See* 15 U.S.C. § 1115(a). Upon showing a likelihood of confusion of the two marks, the plaintiff-registrant may obtain monetary and injunctive relief against the user of the infringing mark. *See* 15 U.S.C. § 1116.

■ In the instant case, the parties do not dispute that Members First's use of its mark predates Members 1st's use of its own mark, nor do they dispute that Members First's mark is federally registered. In its motion for summary judgment, however, Members 1st asserts that its use of its mark cannot be enjoined at this time. Members 1st maintains that although the Lanham Act provides Members First with nationwide rights, an injunctive remedy is available only upon a showing of likelihood of entry into Members 1st's trade territory. It argues that Members First has adduced no evidence to make such a showing.

In advancing this argument, Members 1st places primary reliance on the decision in *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir.1959). *Dawn Donut* was a trademark infringement action by the federal registrant of the trademark "Dawn," used upon large bags of doughnut mix which it sold to bakers in various states, including New York. *Id.* at 361. The defendant operated a retail grocery chain in various counties in New York, within a forty-five mile radius of Rochester, New York, where it also used the mark "Dawn" to sell doughnuts and other baked goods. *Id.* Although the plaintiff conducted wholesale business in Rochester, the trial court found that the plaintiff's retail sale of doughnuts in New York had been confined to areas not less than sixty miles from the Rochester area. *Id.*

One of the issues presented to the appellate court was whether the plaintiff had made "a sufficient showing to warrant the issuance of an injunction against the defendant's use of the mark 'Dawn' in a trading area in which the plaintiff has for thirty years failed to employ its registered mark." *Id.* at 364. The court began its analysis by noting that the Lanham Act provides that a registrant "may enjoin only that concurrent use which creates a likelihood of public confusion as to the origin of the products in connection with which the marks are used." *Id.* Absent a likelihood of confusion, therefore, no cause exists to enjoin the non-registrant's use of the mark. *See id.* Applying these principles to the "Dawn" mark, the court found that as long as the parties continued to use the marks in their "separate trading areas," no public confusion was likely. *Id.* at 364–65. The court further found that there was "no present prospect that [the] plaintiff will expand its use of the mark at the retail level into [the] defendant's trading area." *Id.* at 365. Accordingly, the court determined injunctive relief to be unwarranted. *Id.*

In reliance on *Dawn Donut* and its progeny,[12] Members 1st argues that the

11. Under the Lanham Act, service marks, which are used to identify the source of services, are entitled to the same legal protection as trademarks, which are used to identify the source of goods. *See* 15 U.S.C. § 1053. "Although technically distinct, the terms are often used interchangeably, with no significant legal consequences." *Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 855 (3d Cir. 1992).

12. Since its articulation in 1959, the *"Dawn Donut Rule"* has been cited favorably in the majority of circuits, including the Third Circuit. *See, e.g., Comidas Exquisitos, Inc. v. O'Malley & McGee's, Inc.*, 775 F.2d 260, 262 (8th Cir.1985); *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1536 (4th Cir.1984); *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 640 (D.C.Cir.1982) (per curiam); *Value House, Inc. v. Phillips Mercantile Co.*, 523 F.2d 424, 429 (10th Cir.1975); *Holiday Inns of America*,

court need not reach the likelihood of confusion issue at all because Members First cannot show an imminent likelihood of entry into Members 1st's trade territory. The court, however, questions the applicability to the instant case of the "*Dawn Donut* Rule" that no likelihood of confusion can exist and thus no injunction may issue so long as the parties continue to operate in distinct geographical markets and the registrant has no imminent plans to expand into the non-registrant's trade territory. First, the distinctness of the markets in the instant case is a fiercely contested factual issue.[13] Furthermore, the *Dawn Donut* court emphasized the geographic remoteness of the parties' trading areas, noting the district court's finding that retail purchasers usually purchase baked goods reasonably close to their homes due to the perishable nature of the goods. 267 F.2d at 364. The products at issue in this case are not goods but rather, banking and financial services. Although, as credit unions, the parties are limited in whom they may solicit or to whom they may provide services, the undisputed facts indicate that the membership of each is not confined to any particular geographical region.[14] Indeed, as Members First points out, both parties market their services through the Internet, a medium in which geography is largely irrelevant. (Members First's Opp.Br. to Mot. for Summ.J. at 16; Exs. A, B.) Thus, while the distance between the parties' branch offices may be a consideration in determining whether a likelihood of confusion exists, the court cannot decide as a matter of law that the geographic distance between the branch

offices eliminates any possibility of confusion. To so hold would also be to utterly disregard the evidence of actual confusion introduced by Members First in support of its own motion for partial summary judgment and a permanent injunction. (Members First's Stmt. of Undisp.Mat. Facts ¶¶ 17–44.)

Additionally, the court observes that the Third Circuit's single application of the *Dawn Donut* Rule thirty years ago involved an island setting "to which one arrives by ship or plane and not by turnpike" and which was over a thousand miles east of the plaintiff's mainland operation and separated by seventy miles of sea from the nearest island unit. *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir.1969) (plaintiff not entitled to enjoin defendant's use of identical mark in Virgin Islands when plaintiff had no operations in that area). The Third Circuit later summarized its *Holiday Inns* decision as discussing "the extent to which *injunctive relief* is available to protect the holder of a registered trademark." *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1404 (3d Cir.1985). Furthermore, the *Natural Footwear* court pointed out that whereas the Virgin Islands which are "uniquely isolated from other states [,][s]uch isolation is not at issue as to the continental United States...." *Id.* n. 54. Thus, to the extent that Members 1st argues that the 140 to 173 miles between its branch offices and Members First's Towanda, Pennsylvania branch preclude Members First from obtaining injunctive relief, the argument is unavailing.

---

*Inc. v. B & B Corp.*, 409 F.2d 614, 618–19 (3d Cir.1969); *Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 844 (9th Cir. 1969); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 625–26 (5th Cir.1963).

**13.** For example, the parties dispute how credit unions maintain and expand their fields of membership. Members 1st contends that Members First is limited by its charter from recruiting SEG's located outside a 25–mile radius of a branch office. Members First, in turn, contends that this is an improper inter-

pretation of its charter, that its charter can be amended, and that legislation recently passed by Congress will have a significant impact on the way that credit unions do business.

**14.** As discussed in the factual background, *supra* Part I, Members First has members in at least eighteen states and overseas. Although all of its branches are located in central Pennsylvania, Members 1st has members outside that region.

Furthermore, insofar as Members 1st argues that Members First cannot establish a likelihood of confusion because of the distances between the parties' branch offices, the court does not consider this factor dispositive. Nearly a decade after *Holiday Inns*, the Third Circuit articulated a comprehensive, ten-factor standard for proving likelihood of confusion, and hence, infringement under the Lanham Act in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978). These factors include the following: (1) the degree of similarity between the marks; (2) the strength of the plaintiff's mark; (3) the price of the goods or services and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (7) whether the goods or services, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods or services in the minds of the public because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the plaintiff to manufacture a product in the defendant's market. *Id.* The *Scott Paper* test has since prevailed as the premier standard for likelihood of confusion in the Third Circuit. *See, e.g., A&H Sportswear v. Victoria's Secret Stores, Inc.*, 166 F.3d 191, 194 (3d Cir.1999); *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462–63 (3d Cir.1983).[15] This court, therefore, declines to supplant the *Scott Paper* test with a geographic distance test to determine service mark infringement.

If Members First can demonstrate a likelihood of confusion of the two marks under the *Scott Paper* test, it seems anomalous to preclude it from obtaining injunctive relief simply because of the geographic distance between its branch offices and those of Members 1st. The court notes that even though the Third Circuit has not addressed the interplay between *Scott Paper* and *Holiday Inns* and the relevance of the *Dawn Donut* rule in a highly mobile, technologically-driven society, one circuit court recently addressed the issue squarely: In *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir.1999), the Sixth Circuit clarified that likelihood of entry into the defendant's market is just one factor in its multi-faceted test for infringement and is not dispositive of liability or the availability of injunctive relief. If, as Members 1st contends, the parties do indeed operate in separate and distinct markets without any imminent plans for overlap, then it is unlikely that Members First will be able to succeed under the *Scott Paper* test. If Members First cannot prove a likelihood of confusion under *Scott Paper*, then a *fortiori*, it will not be entitled to injunctive relief.

For the foregoing reasons, therefore, the court will deny Members 1st's motion for summary judgment. The court will next address Members First's motion for partial summary judgment and permanent injunctive relief.

### B. *Members First's Motion for Partial Summary Judgment and a Permanent Injunction*

Members First seeks summary judgment with respect to its trademark infringement claims under the Lanham Act. As previously discussed, the plaintiff in a trademark infringement action must prove that: (1) its mark is valid and legally protectable; (2) ownership of the mark by

---

**15.** The ten-factor test, however, does not apply if the parties offer competing goods or services. *Lapp,* 721 F.2d at 462. Products or services are considered to be in direct competition if they are substitutable or interchangeable. *See Acxiom, Corp. v. Axiom, Inc.,* 27 F.Supp.2d 478, 492–493 (D.Del.1998); *Safeguard Business Sys., Inc. v. New England Business Sys., Inc.,* 696 F.Supp. 1041, 1044 (E.D.Pa.1988).

the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). Registration of a mark under the Lanham Act constitutes *prima facie* evidence of a mark's validity and its ownership by the registrant. *See* 15 U.S.C. §§ 1057(b), 1115(a). However, once a mark becomes incontestable, its registration constitutes conclusive evidence of the mark's validity and its ownership of the registrant. *See* 15 U.S.C. § 1115(b).

A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years subsequent to registration, and that there is no pending proceeding and has been no adverse decision concerning the registrant's ownership or right to registration of the mark. *See* 15 U.S.C. § 1065. In the instant case, Members First filed its application for registration on August 17, 1994 and obtained registration in February 27, 1996. *See supra* Part I. Accordingly, Members First's mark has not achieved incontestability.

 Where a mark is federally registered but has not achieved incontestability, validity depends on proof of secondary meaning, unless the mark itself is inherently distinctive. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 291–92 (3d Cir.1991). Secondary meaning is demonstrated where, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3d Cir.1984) (internal quotations and citation omitted). Although no consensus exists as to the elements of secondary meaning, a non-exhaustive list of factors to be considered includes "the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the

fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion." *Ford,* 930 F.2d at 292.

 If, however, a mark is inherently distinctive, no proof of secondary meaning is required. *See id.* at 291.

Distinctive marks include those which are arbitrary, fanciful, or suggestive. Arbitrary marks are those words, symbols, pictures, etc., which are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services. Fanciful marks consist of "coined" words which have been invented for the sole purpose of functioning as a trademark. Marks such as letters, numbers, product and container shapes, and designs and pictures may also be classed as "fanciful."

*Id.* at 292 n. 18 (internal quotations and citations omitted). Suggestive marks are those which "suggest rather than describe the characteristics of the goods" or services. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 297 (3d Cir.1986). "A term is suggestive if it requires imagination, thought, or perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *Dranoff–Perlstein Assocs. v. Sklar,* 967 F.2d 852, 858 (3d Cir.1992). Another factor to consider is whether sellers of similar products or services are likely to use, or actually do use, the term in connection with their goods. *See id.* "Frequent use of a term by sellers of similar products or services tends to indicate that the term is descriptive or generic rather than suggestive." *Id.* The proper characterization of a mark is an issue of fact. *See Ford,* 930 F.2d at 292 n. 18.

In the instant case, the parties dispute the proper characterization of Members

First's mark. Members First argues that the mark is suggestive because it requires "one to apply some imagination to deduce that the credit union intends to put its members first in providing services." (Members First's Br. in Supp. of Mot. for Partial Summ. J. at 16.) Members 1st, in turn, argues that the mark is descriptive in that it requires little or no imagination to reach the conclusion that the credit union has a goal or philosophy of putting its members first. Furthermore, Members 1st identifies three other federal credit unions and eleven state credit unions in the United States that are currently operating under the names "Members First," "Members 1st," "Members One," "Member One," or "Member 1." (Members 1st's Br. in Opp. to Mot. for Partial Summ. J. at 14.) It further points out that the 1998 Credit Union Directory, published by Callahan & Associates, Inc., lists 29 credit unions whose names begin with the word "Member" or "Members." (*Id.*, Ex. R.) Moreover, it proffers evidence that the NCUA's Internet website lists 43 credit unions with the word "Members" in their names, 148 with the word "First" in their names, and 25 with term "1st" in their names. (*Id.*, Ex. S.) Finally, it points out that in the category of financial services alone, the United States Patent and Trademark Office has 65 active registered marks with the word "Members," 36 active registered marks which include the term "Members," and 982 registered marks that include the term "First" or "1st." (*Id.*, Ex. T.)

In light of this evidence, the court cannot conclude that Members First's mark is inherently distinctive and thus, valid and enforceable without proof of secondary meaning.[16] As noted above, the preva-

lence of use of a particular term by other sellers or providers of services may indicate that a mark is descriptive, rather than suggestive. Although Members First argues that the court should consider only evidence of other credit unions using the words "Members First" or "Members 1st" and that this evidence is slight in comparison to the number of credit unions in the country, the court cannot say, at this juncture, that the "Members First" mark is inherently distinctive as a matter of law.

Given that a genuine issue of material fact exists as to whether the mark is descriptive or suggestive, the court finds that Members First is not entitled to summary judgment on its trademark infringement claims.[17] Accordingly, the court will deny Members First's motion for partial summary judgment and permanent injunctive relief.

### C. *Members First's Supplemental Motion for Partial Summary Judgment*

Section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a), provides that registration of a mark "shall not preclude an opposing party from proving any legal or equitable defense or defect, including those set forth in subsection (b), which may have been asserted if such mark had not been registered." Section 33(b), in turn, provides:

If the right to use the mark has become incontestable under [15 U.S.C. § 1065], the registration shall be considered conclusive evidence of the registrant's exclusive right to use the registered mark . . . except when one of the following defenses or defects is established:

---

16. While the court recognizes that registration entitles Members First to a presumption of validity of its mark, the presumption in this case has been challenged by Members 1st's evidence of the descriptive nature of the mark. If the mark is descriptive, Members First must prove that the mark has acquired secondary meaning. Members First does not, however, provide any proof of secondary meaning in its brief.

17. Given that a genuine issue of material fact exists with respect to the first element of Members First's trademark infringement claims, namely validity; the court need not address the adequacy of the third element, likelihood of confusion.

. . .

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to [Section 15 U.S.C. § 1057(c) ] . . .; Provided, however, that this defense or defect shall apply only for the area in which such continuous use is proven.

15 U.S.C. § 1115(b).

On January 8, 1999, Members 1st amended its answer to include the "limited area" defense of Section 33(b)(5), 15 U.S.C. § 1115(b)(5). In its supplemental motion for partial summary judgment, Members First asserts that the defense must fail. The parties' dispute with respect to the motion revolves around two issues: (1) the extent of Members 1st's knowledge; and (2) the effect of "mere" knowledge, absent any bad faith, upon the defense. The court will discuss each issue seriatim.

### 1. *Extent of Knowledge*

Members 1st concedes that it learned of a "Members First Federal Credit Union" in Louisville, Kentucky and a "Members First Credit Union" in Towanda, Pennsylvania through a trademark search report. It asserts that the report listed a number of "Members First" credit unions, both federal and state, in North Carolina, Indiana, Illinois, Wisconsin, and Kentucky. Members 1st maintains that nothing in the report suggested that the Towanda, Pennsylvania "Members First Credit Union" was affiliated with the "Members First Federal Credit Union" in Louisville, Kentucky. As such, it maintains that it had knowledge of Members First only in connection with its location in Kentucky.

While it is unclear from this argument what effect Members 1st's purportedly limited knowledge should have, the court, nonetheless, finds the argument unpersuasive. First, as Members First points out,

its federal registration extends only to the words "Members First," not to "Federal Credit Union" which are disclaimed in its registration. Second, that Members 1st knew of Members First's Kentucky operation but not its Pennsylvania office is immaterial to the issue of knowledge: the undisputed facts show that Members 1st knew that someone else was using the name "Members First." Indeed, Members 1st cites no authority defining knowledge on the basis of geographical location. While the geographic location of Members First's branches is probative of the relative distance between or overlap of the parties' markets, it is irrelevant to the issue of knowledge. Accordingly, the court concludes that Members 1st had knowledge of Members First's use of its mark prior to Members 1st's adoption of its own mark.

### 2. *Effect of Knowledge*

The court next addresses the issue of the effect of such knowledge upon Members 1st's 15 U.S.C. § 1115(b)(5) defense. Members 1st contends that mere knowledge is insufficient to defeat the defense but rather, also requires some "bad faith" on its part. In making this argument, Members 1st urges the court to adopt the reasoning of *ACCU Personnel v. AccuStaff, Inc.*, 846 F.Supp. 1191 (D.Del.1994) in which the court held that knowledge was probative, but not dispositive of, bad faith.

Members First points out that *ACCU Personnel* does not represent the law of this circuit, as it was decided by a sister district court, not the Third Circuit. Furthermore, it argues that even if the reasoning of the *ACCU Personnel* court is sound, the case involved common law trademark rights, not rights under the Lanham Act. Members First contends that even if the *ACCU Personnel* court properly construed the common law "good faith prior user" doctrine, the statutory "limited area" exception contained in § 1115(b)(5) is considerably narrower and defensible by mere knowledge.

### i. *Common Law Doctrine*

This dispute raises a novel and complex issue regarding the interplay of common law and statutory trademark rights that has yet to be addressed by the courts. The principles governing the territorial extent of trademark rights under the common law were enunciated by the Supreme Court in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), and refined in *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). *Hanover* involved a senior user who began marketing its flour under the mark "Tea Rose" in 1872, making most of its sales in Massachusetts, Pennsylvania, and Ohio. 240 U.S. at 409, 36 S.Ct. 357. Without knowledge of the senior user, the junior user began marketing its flour under the "Tea Rose" mark in 1904, with the majority of its sales in Mississippi, Florida, Georgia, and Alabama. *Id.* at 410, 36 S.Ct. 357. In 1912, upon learning of the junior user's use of the mark, the senior user asserted nationwide rights. *Id.* at 407, 36 S.Ct. 357. The lower court refused to enjoin the junior user's use of the mark, finding that it had adopted the mark "in perfect good faith, with no knowledge that anybody else was using or had used those words in such a connection" and had built up its own trade territory in four states. *Id.* at 412, 36 S.Ct. 357.

The Supreme Court began by noting that "[t]he redress that is accorded in trademark cases is based upon the party's right to be protected in the good will or trade of a business." *Id.* The right, however, comes from the use, not mere adoption, of a mark. *Id.* at 413, 36 S.Ct. 357. That is, the property rights protected by trademark law lie not in the mark itself, but rather, in the good will and reputation generated by use of the mark. Thus, the ordinary case, where two parties are competing under the same mark in the same market, can be resolved simply on the basis of priority of appropriation. *Id.* at 415, 36 S.Ct. 357. In the special case:

where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant; unless, at least, it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take benefit of the reputation of his goods, to forestall the extension of his trade, or the like.

*Id.* In this circumstance, the senior user has not gained good will or reputation from its use of the mark in the remote market; to the contrary, the mark has come to signify the junior user's goods in that market. *Id.*

A similar situation arose in *Rectanus*, which involved a senior user who marketed its medicines under the "Rex" label, initially in Massachusetts. 248 U.S. at 94, 39 S.Ct. 48. Nearly six years later and without knowledge of the senior user, the junior began marketing similar medicines under the same name in Louisville, Kentucky. *Id.* The dispute arose when the senior user expanded into the junior user's market almost twenty years later. *Id.* at 95, 39 S.Ct. 48. Again, the Court began by reference to the principle that property rights are not inherent in a trademark but rather, appurtenant to the use of the mark in a business or trade. *Id.* at 97, 39 S.Ct. 48.

It results that the adoption of a trademark does not, at least in the absence of some valid legislation enacted for the purpose, project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade.

*Id.* at 98, 39 S.Ct. 48. Thus, the Court held that the right of a senior user, expanding into a new, remote market, are subordinate to the trademark rights already acquired in good faith by another user in that market. *Id.* at 101, 39 S.Ct. 48.

Collectively known as the "Tea Rose–Rectanus doctrine," these principles continue to govern territorial rights in unregistered trademarks. *See, e.g., ACCU Personnel,* 846 F.Supp. at 1205. It follows from the doctrine that "the senior user of a common law mark may not be able to obtain relief against the junior user in an area where [the senior user] has no established trade, and hence no reputation and good will." *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1394 (3d Cir.1985). In order to rely on the "good faith prior user" defense, the junior user must prove two elements: (1) that it adopted its mark in good faith; and (2) that it employed the mark in a market remote from that of the senior user. *See GTE Corp. v. Williams,* 904 F.2d 536, 541 (10th Cir.1990).

#### ii. *Statutory Exception*

By comparison, the § 1115(b)(5) "limited area" exception is one of nine enumerated statutory defenses. *See* 15 U.S.C. § 1115(b)(1)–(9). Courts have considered the limited area defense as codifying the "essence" of the common law Tea Rose–Rectanus doctrine. *See, e.g., Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc.,* 831 F.2d 1177, 1181 (1st Cir.1987). Courts have not, however, addressed whether the statutory exception is as broad as or merely carved from the common law doctrine. Confusion on this issue can be traced to two sources: (1) ambiguities regarding the proper application of the defense; and (2) the language of the statutory defense or exception.

The statutory exception is listed under the subheading "Incontestability; defenses." *See* 15 U.S.C. § 1115(b). Views on the application of the § 1115(b) defenses to contestable marks, however, have vacillated. Under the Lanham Act, a mark may only becomes incontestable after it is continuously used in commerce for five years after registration. *See* 15 U.S.C. § 1065.[18] As previously discussed, once a mark become incontestable, its registration constitutes conclusive evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce, subject only to the § 1115(b) defenses. *See id.* § 1115(b). By comparison, registration of a mark that has yet to become incontestable comprises only prima facie evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark, subject to all common law defenses. *See id.* § 1115(a).[19]

When asked to apply the § 1115(b)(5) exception to contestable marks, prior to 1985, courts reasoned that a statutory defense available against incontestable marks which enjoy greater protection must, a fortiori, be equally available against contestable marks. *See, e.g., Value House v. Phillips Mercantile Co.,* 523 F.2d 424, 429 (10th Cir.1975); *Matador Motor Inns, Inc. v. Matador Motel, Inc.,* 376 F.Supp. 385, 387 (D.N.J.1974); *Avon Shoe Co. v. David Crystal, Inc.,* 171 F.Supp. 293, 299 (S.D.N.Y.1959), *aff'd,* 279 F.2d 607 (2d Cir. 1960), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). In 1985, however, the Supreme Court decided *Park 'N Fly v. Dollar Park and Fly, Inc.,* in which it noted that the § 1115(b) defenses "are not substantive rules of law which go to the validity or enforceability of an incon-

---

18. Incontestability further requires: (1) the absence of any final decision adverse to the registrant's claim of ownership of the mark or its rights to register the same; (2) that no proceedings involving these rights are pending in the United States Patent and Trademark Office or any court; and (3) the filing of an affidavit within a year after the expiration of the five-year period; and (4) that the mark has not become generic. *See* 15 U.S.C. § 1065.

19. As the court previously concluded, supra Part III.B., the mark at issue in the instant case is contestable. The undisputed facts establish that Members First filed its application for registration on August 17, 1994 and obtained registration on February 27, 1996, see *supra* Part I.

testable mark." 469 U.S. 189, 199 n. 6, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Relying on the legislative history of the Lanham Act, the Court stated that the defenses operate to reduce the evidentiary status of registration of the mark, from conclusive to merely *prima facie* evidence of validity, ownership, and exclusive rights to use the mark. *See id.*

In light of the Court's clarification of this point, lower courts retreated from the position that § 1115(b)(5) is applicable to incontestable and contestable marks alike. As § 1115(b)(5) was only a defense to the conclusiveness of the evidentiary presumption arising from incontestability, courts found that the statutory defense had no relevance to contestable marks. *See GTE Corp. v. Williams,* 904 F.2d 536, 540 (10th Cir.1990); *Thrifty Rent–A–Car System v. Thrift Cars, Inc., ("Thrifty I"),* 639 F.Supp. 750, 755 (D.Mass.1986), *aff'd,* 831 F.2d 1177 (1st Cir.1987); *Dana Corp. v. Racal Electronics Public Ltd. Co.,* No. 85 C 428, 1987 WL 18948, *4 (N.D.Ill. Oct.22, 1987). Instead, courts applied the common law Tea Rose–Rectanus doctrine to determine the rights of a good faith prior user. *See GTE Corp.,* 904 F.2d at 541; *Thrifty I,* 639 F.Supp. at 755; *Dana Corp.,* 1987 WL 18948, at *5.

The issue, nevertheless, did not remain resolved. Effective November 16, 1989, Congress amended § 1115(a) to make the § 1115(b) defenses equally available against contestable marks. *See* Trademark Law Revision Act of 1988, Nov. 16, 1988, P.L. No. 100–667, § 128, 102 Stat. 3935. According to the Senate Report on the legislation, the amendment "codifie[d] judicial decisions holding that the enumer-ated defenses or defects to an action for infringement of an incontestable registration, which are set forth in [15 U.S.C. § 1115], are equally applicable in actions for infringement of marks which are not incontestable." S.Rep. No. 100–515, at 38 (1988) *reprinted in* 1988 U.S.C.A.A.N. 5577, 5601.

Courts have since consistently applied § 1115(b)(5) as a substantive defense, rather than merely affecting the evidentiary presumption. *See, e.g, Champions Golf Club, Inc. v. Champions Golf Club, Inc.,* 78 F.3d 1111, 1123–24 (6th Cir.1996); *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.,* 62 F.3d 690, 692 (5th Cir.1995); *Century 21 Real Estate Corp. v. Century 21 Real Estate, Inc.,* 929 F.2d 827, 829 (1st Cir.1991); *Proriver, Inc. v. Red River Grill,* 27 F.Supp.2d 1, 4 (D.D.C.1998); *Four Seasons Hotels Ltd. v. Koury Corp.,* 776 F.Supp. 240, 246 (E.D.N.C.1991).[20] Furthermore, courts have assumed without discussion that proving the § 1115(b)(5) defense also establishes the common law defense under the Tea Rose–Rectanus doctrine. *See* J. Thomas McCarthy, 4 Trademarks and Unfair Competition § 26.48 (4th ed.1996).[21] The assumption is unproblematic if the two defenses are, indeed, identical. Even if the statutory defense were narrower than the common law defense, satisfaction of the former could be taken to establish the latter, but not vice versa. No court, however, seems to have engaged in a comparison of the relative breadths of the exceptions.

This court must squarely address the issue in this case, where the junior user has raised only the statutory defense.

20. Although the court in *GTE Corp. v. Williams,* 904 F.2d 536, 540 (10th Cir.1990), determined that § 1115(b)(5) only affected the evidentiary presumption accorded to incontestable marks and was not a substantive rule of law, the case is distinguishable as the lower court's decision was issued prior to the amendment of § 1115(a). *See GTE Corp. v. Williams,* 649 F.Supp. 164 (D.Utah 1986).

21. It is worth noting that McCarthy continues to maintain that § 1115(b)(5) is not a defense on the merits but rather, merely negates the conclusive evidentiary effect of incontestability. J. Thomas McCarthy, 4 Trademarks and Unfair Competition § 26:47 (4th ed.1996). He does not, however, discuss the 1989 Lanham Act amendment of § 1115(a) or its impact upon the continuing validity of the Supreme Court's reasoning in *Park 'N Fly. Id.*

One obvious difference between the statutory and the common law defenses is the terminology used in each. Whereas the Tea Rose–Rectanus doctrine protects good faith and geographically remote users of a mark, *see ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1209 (D.Del. 1994), the statutory exception applies when the mark "was adopted without knowledge of the registrant's prior use and has been continuously used by such party" from, inter alia, a date prior to the date of constructive use of the mark, or the date of filing of the application for registration of the mark. 15 U.S.C. § 1115(b)(5). In *ACCU Personnel*, the United States District Court for the District of Delaware addressed whether the defendant's prior knowledge of the plaintiff's use of a mark precluded a finding of good faith for the purposes of the common law defense. 846 F.Supp. at 1209–1211. After noting that the texts of *Hanover* and *Rectanus* supported both views, the court concluded that "a junior user's prior knowledge of a senior user's trademark use is probative of, but not dispositive of, the question whether the junior user acted in bad faith." *Id.* at 1211; *accord GTE Corp.*, 904 F.2d at 541.

The *ACCU Personnel* court, nevertheless, was expounding the common law, Tea Rose–Rectanus doctrine, not the statutory exception. Although the Third Circuit has yet to address the issue, every court of appeals to apply § 1115(b)(5) has enumerated lack of knowledge as an element of the statutory defense. *See, e.g., Champions Golf Club. Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1123–24 (6th Cir. 1996); *Brittingham v. Jenkins*, 914 F.2d 447, 453 (4th Cir.1990); *Thrifty Rent–a–Car System, Inc. v. Thrifty Cars, Inc.* ("*Thrifty II*"), 831 F.2d 1177, 1180 (1st Cir.1987); *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 640 (D.C.Cir.1982) (per curiam). Given that Members 1st pled only the statutory defense, not the common law defense in the instant case, the court cannot ignore the plain language of the statute which requires the lack of knowledge, not merely good faith.

Furthermore, even if Members 1st had pled the common law defense, the court is not persuaded that the defense is sustainable in light of Members 1st's knowledge of Members First's use of its mark. As previously noted, both *Hanover* and *Rectanus* involved defendants who adopted the infringing marks without knowledge of the plaintiff's use. The Lanham Act, however, abolished the good faith defense by allowing federal registration of a trademark to serve as constructive notice of the registrant's claim of ownership. *See* 15 U.S.C. § 1072. Consequently, courts agree that subsequent users of a registered mark cannot defend on the basis of lack of knowledge or good faith. *See, e.g., Dawn Donut Co. v. Hart's Food Stores, Inc.* 267 F.2d 358, 362 (2d Cir.1959). In an aside, the Third Circuit summarized the Tea Rose–Rectanus doctrine as holding that:

> "the senior user's use of a mark in one region would not suffice to prevent a junior user from using the same mark in a region where the senior user's goods were unknown *so long as the junior user adopted the mark without knowledge and of the senior user's mark and thus in good faith*."

*A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 295 n. 4 (3d Cir.1986) (emphasis added).[22]

In light of Members 1st's knowledge of Members First's use of its mark, the court

**22.** The court recognizes that, in a case not cited by either party, the Third Circuit recently upheld a district court's finding of no bad faith or deliberate intent to infringe by a defendant who had knowledge of the plaintiff's mark. *See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 191, 196 (3d Cir.1999). However, the issue of bad faith in that case arose within the context of the likelihood of confusion test, not the affirmative defenses of limited area or good faith, prior user. *See id.* While no court in this circuit has expressly equated or distinguished good faith in these two contexts, this court considers them distinguishable.

concludes that its statutory defense under § 1115(b)(5) must fail. Accordingly, the court will grant Members First's supplemental motion for partial summary judgment.

### IV. *Conclusion*

In accordance with the foregoing discussion, the court will deny Members 1st's motion for summary judgment and Members First's motion for partial summary judgment and a permanent injunction. The court will grant Members First's supplemental motion for summary judgment. An appropriate order will follow.

### ORDER

In accordance with the accompanying memorandum of law, IT IS HEREBY ORDERED THAT:

(1) Defendant Members 1st Federal Credit Union's motion for summary judgment is **DENIED.**

(2) Plaintiff Members First Federal Credit Union's motion for partial summary judgment and a permanent injunction is **DENIED.**

(3) Plaintiff Members First Federal Credit Union's supplemental motion for partial summary judgment is **GRANTED.**

(4) The Clerk of Court shall defer the entry of judgment until the conclusion of this case.